**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VERB TECHNOLOGY COMPANY, INC. F/K/A NFÜSZ, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BELLRIDGE CAPITAL, LP,<br><br>Defendant. | CIVIL ACTION NO.<br><br>**COMPLAINT** |

Plaintiff Verb Technology Company, Inc. f/k/a nFüsz, Inc. ("Verb"), by and through its attorneys, alleges as follows:

## NATURE OF THE CASE

1. This is an action in which defendant, Bellridge Capital, LP ("Bellridge"), improperly seeks to leverage a cybersecurity incident into a purported event of default, and concomitantly, a windfall for itself, under promissory notes issued to it by plaintiff, Verb. Indeed, Bellridge entered into two promissory notes as payee or holder, with Verb, as maker, in the aggregate adjusted amount of $2,025,000. Although the notes bore maturity dates of April 19, 2019 and August 1, 2019, pursuant to the terms of the notes, their maturity dates were accelerated due to Verb's closing of a Follow-on Public Offering ("FPO") on April 9, 2019. Within three days of that date, as required under the notes, Verb initiated a wire to what it thought was Bellridge in the amount of $2,025,000—the entire outstanding principal under the notes. However, due to a fraudulent email "spoofing" scam that, upon information and belief, was the result of a prior cybersecurity breach of Bellridge's computer network, these funds were mis-directed to a bank account established by the third-party "spoofer." When Bellridge advised Verb that it had not

received the wired funds, Verb leapt into action. Verb uncovered the mis-routing of the funds due to the "spoofing" scam, and worked diligently and tirelessly to recover the mis-routed funds, ultimately wiring them to Bellridge just eight days after what would have been the applicable "cure" date under the note had an actual, and not manufactured, event of default occurred.

2. Even though a cybersecurity breach to Bellridge's network appears to have caused this brief delay in payment, and even though—despite this unfortunate incident—Verb took extraordinary steps to ensure that Bellridge expeditiously received payment in full, Bellridge nevertheless seeks to leverage this occurrence into a windfall for itself.

3. Indeed, by written notice dated May 15, 2019, Bellridge (i) took the absurd position that Verb had defaulted on its payment obligations under the notes, (ii) demanded that Verb pay an additional "outstanding balance" in the amount of $202,500—a 10% "mandatory default" penalty under the notes—and other damages, and (iii) purported to exercise its right to convert the notes into shares of Verb common stock equal in value to the "outstanding balance" created by the non-existent default, *i.e.*, $202,500, at a 30% discount from the lowest trading price of Verb's stock during the preceding 10 days, which would result in an aggregate "value" in excess of approximately $290,000.00.

4. Bellridge's bad faith attempt to profit from this "spoofing" incident—despite Verb's extraordinary efforts to recover the funds successfully and to re-direct the recovered funds to Bellridge—is contrary to both the letter and the spirit of the notes, as well to applicable law, and has created an immediate justiciable controversy between the parties.

5. Accordingly, as set forth more fully below, Verb seeks an Order from this Court, under 28 U.S.C. §§ 2201 and 2202, declaring that (i) no event of default has occurred under the terms of the notes, (ii) Bellridge is not entitled to an additional 10% of the notes' aggregate

principal amount—or to any other amounts, costs, expenses or damages in connection with the notes, including, without limitation, liquidated damages—and (iii) accordingly, no "outstanding balance" remains under the notes that would entitle Bellridge to convert the same into shares of Verb common stock.

6. Further, by improperly declaring an event of default under the notes and wrongly seeking to convert the purported outstanding principal balance into shares of Verb common stock—despite having received payment in full of the $2,025,000 due under the notes—Bellridge also has breached its obligations to Verb under the notes, causing Verb to suffer significant and ongoing damages, in an amount that Verb will prove at trial.

## PARTIES

7. Plaintiff Verb is a Nevada corporation formerly known as nFüsz, Inc., with its principal place of business located at 344 S. Hauser Blvd., Suite 414, Los Angeles, California 90036. Effective February 1, 2019, nFüsz, Inc. changed its corporate name to Verb Technology Company, Inc.

8. Upon information and belief, defendant Bellridge is a Delaware limited partnership, with its principal place of business in Fort Lauderdale, Florida.

9. Upon information and belief, Boris ("Robert") Klimov, the Managing Partner of Bellridge, is domiciled in Sunny Isles Beach, Florida.

10. Separate and apart from Mr. Klimov who is the Managing Partner of Bellridge, to the extent that there are any limited partners of Bellridge, upon information and belief, they are not domiciled either in Nevada or California (where Verb is incorporated and has its principal place of business, respectively), and Mr. Klimov is not domiciled in either of those States.

11. Non-party, A.G.P./Alliance Global Partners ("AGP"), is a national investment firm and underwriter that provided advisory and placement services for Verb and Bellridge in connection with the bridge financing transaction at issue, as discussed below.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because Verb is a citizen of Nevada and California, and Bellridge and its partners are citizens of Delaware and Florida, making the parties completely diverse, and because the amount in controversy exceeds $75,000. This action also seeks remedies based upon the laws authorizing actions for declaratory judgment in the courts of the United States. *See* 28 U.S.C. §§ 2201 and 2202.

13. This Court has personal jurisdiction over Bellridge, and venue is properly laid in this Court, because Verb's claims arise under a mandatory forum selection clause in the Transaction Documents (as defined below).

14. In particular, the Transaction Documents state that any disputes arising between the parties thereunder shall be litigated in the state and federal courts located in the City of New York, Borough of Manhattan. (*See infra*, Exs. B, D § 7(d)).

15. In the Transaction Documents, the parties also agreed not to challenge personal jurisdiction in the New York federal or state courts, and waived any assertion that venue in these courts is improper or inconvenient. (*See infra*, Exs. B, D § 7(d)).

## FACTUAL ALLEGATIONS

16. Verb is a technology company that provides online applications services and marketing cloud-based business software products. Its flagship product, TaggCRM, is a Customer Relationship Management application that allows sales and marketing professionals to communicate with their clients or prospects through interactive videos containing clickable

"Taggs" such as icons, buttons and other on-screen elements. These Taggs allow prospects and customers to respond to sales and marketing professionals' calls to action in real-time, such as by clicking on a product featured in a video and buying it, or by clicking on a calendar icon in the video to make an appointment with a salesperson.

***AGP Introduces Verb to Bellridge to Provide Bridge Financing.***

17. In November 2018, Verb entered into an agreement to purchase Sound Concepts, Inc. ("Sound Concepts"), a Utah-based provider of digital marketing and sales support services to the direct sales industry.

18. To secure financing in connection with its anticipated acquisition of Sound Concepts, its potential FPO, and its then-pending application to list its common stock ("Common Stock") on the NASDAQ Capital Market, Verb sought to obtain bridge financing from an interested third party.

19. To that end, in or around October 2018, AGP introduced Verb to Bellridge, a private equity investment firm that expressed interest in providing financing to Verb.

20. Subsequent to that introduction, AGP served as the intermediary between Bellridge and Verb, facilitating communications between the parties. Verb and Bellridge did not ordinarily exchange direct written communications with respect to the bridge financing transaction; rather, written communications between Bellridge and Verb typically were either sent to, or sent by, AGP.

***The Securities Purchase Agreements and the Promissory Notes.***

21. To consummate the bridge financing, on October 22, 2018, Verb executed and delivered to Bellridge, through AGP, a Securities Purchase Agreement dated October 19, 2018 (the "First SPA"), wherein Verb agreed to sell, and Bellridge agreed to purchase, one or more promissory notes in the aggregate principal amount of $1,500,000, for a purchase price of $1,350,000, which included a 10% original issue discount. In addition, Verb agreed to issue to

Bellridge an aggregate of 1,450,000 shares of Common Stock. A true and correct copy of the First SPA is attached hereto as **Exhibit A**.

22. Also, on October 22, 2018, Verb executed and delivered to Bellridge, through AGP, its promissory note dated October 19, 2018, containing the terms heretofore described, namely, in the principal amount of $1,500,000, for a purchase price of $1,350,000, which included a 10% original issue discount (the "10% OID Note"). The maturity date of the 10% OID Note was April 19, 2019. A true and correct copy of the 10% OID Note is attached hereto as **Exhibit B**.

23. On or about February 1, 2019 Verb executed and delivered to Bellridge, through AGP, a Securities Purchase Agreement dated February 1, 2019 (the "Second SPA"), wherein Verb agreed to sell, and Bellridge agreed to purchase, one or more promissory notes in the initial aggregate principal amount of $500,000 for an aggregate purchase price of $475,000, which included a 5% original issue discount. In addition, Verb agreed to issue to Bellridge a total of 250,000 shares of Common Stock.[1] A true and correct copy of the Second SPA is attached hereto as **Exhibit C.**

24. The Second SPA also provided for the automatic issuance of additional shares of Common Stock—a total of 129,085 shares[2]—in the event the 5% OID Note remained outstanding for 60 calendar days subsequent to the original issue date, which, in fact, occurred, *see infra*. (*See* Ex. C § 4.19).

25. Further, on or about February 1, 2019, Verb executed and delivered to Bellridge, through AGP, its promissory note dated February 1, 2019, in the initial principal amount of

[1] On February 1, 2019, Verb effectuated a 1-for-15 reverse split of the shares of its Common Stock. Accordingly, Verb committed 16,667 shares of Common Stock to Bellridge, *i.e.*, the post-reverse split number of shares under the 5% OID Note.

[2] The post-reverse split number of shares to be automatically issued under this provision was 8,606.

$500,000, for a purchase price of $475,000, which included a 5% original issue discount (the "5% OID Note"; and, together with the 10% OID Note, the "Notes"). The maturity date of the 5% OID Note was August 1, 2019 (the principal became due in April due to Verb's FPO, *see infra*). A true and correct copy of the 5% OID Note is attached hereto as **Exhibit D**.

26. The 5% OID Note also provided for an automatic increase in the principal amount—from $500,000 to $525,000—in the event the 5% OID Note remained outstanding for 60 calendar days subsequent to the original issue date, which, in fact, occurred, *see infra*. (*See* Ex. D § 5(h)).

27. The First SPA (Ex. A), the Second SPA (Ex. C), the 10% OID Note (Ex. B), and the 5% OID Note (Ex. D) collectively are referred to herein as the "Transaction Documents."

***The Mandatory Prepayment and the Spoofed Email.***

28. The Notes provided for a mandatory prepayment in the event Verb consummated its planned FPO, which, in fact, occurred.

29. Specifically, the Notes obligated Verb, within three business days after the closing of its FPO (the "Mandatory Prepayment Date"), to pay to Bellridge an amount of cash equal to the then-outstanding principal amount under the Notes. (*See* Exs. B and D, § 2).

30. On April 9, 2019, Verb closed its FPO.

31. On April 9, 2019, the total outstanding principal amount under the Notes was $2,025,000.

32. Accordingly, under the Notes, the Mandatory Prepayment Date was on or before April 12, 2019.

33. On April 10, 2019 at 10:22 pm EDT, Boris ("Robert") Klimov, Bellridge's Managing Partner, sent an email to Joe Haughton of AGP with the subject "WIRE INFO." The email contained instructions to wire $2,025,000 to Bellridge, as follows:

> Joe, please find the wire instructions below. The amount to be wired is $2,025,000 USD also as per our agreement, the company must issue additional 8,606 common shares. Once both of the above items are satisfied we will release both of the Notes and will consider it paid.
>
> Total amount of shares owed to Bellridge Capital, LP. as per our agreements 122,485 common stock. Please issue it in a book entry form and send us a TA statement.

34. Consistent with the parties' course of dealing in which communications between Verb and Bellridge were delivered by and through AGP, Mr. Haughton forwarded the above email to Rory Cutaia, Verb's Chairman and Chief Executive Officer, and Jeff Clayborne, Verb's Chief Financial Officer, three minutes after receiving the same, at 10:25 pm EDT.

35. Early the next morning, on April 11, 2019 at 7:11 am EDT, an email containing wiring instructions was sent from robertk@bellridlgecapital.com to Joe Haughton at AGP. The sender's email address, robertk@bellridlgecapital.com, was designed to appear as though it belonged to Mr. Klimov, but was, in fact, "spoofed," in that the domain for Mr. Klimov's actual address—"@bellridgecapital.com"—was deliberately misspelled (the "First Spoofed Email").[3] The First Spoofed Email contained Mr. Klimov's name in the header of the "From" field, but the sender's email address actually belonged to a third party, *i.e.*, the cyberattacker. A true and correct copy of the First Spoofed Email is attached hereto as **Exhibit E**.

36. The First Spoofed Email contained the subject "Re: WIRE INFO" and included the instructions contained in the body of Mr. Klimov's email from 10:22 pm EDT of the previous evening, as well as Mr. Haughton's reply to the same, presumably reflecting a deliberate effort by

---

[3] Email spoofing is the forgery of an email header so that the message appears to have originated from someone other than the actual source. One type of email spoofing is "spear phishing," which is an attack that targets a specific organization or individual, seeking unauthorized access to sensitive information.

the cyberattacker to make the First Spoofed Email appear as though it was a bona fide reply to the earlier emails. (*See* Ex. E).

37. The First Spoofed Email was addressed to Mr. Haughton, with a copy to Messrs. Cutaia and Clayborne, stating:

> Good Morning Joe, please find attached the Final payoff settlement instructions. The amount to be wired is $2,025,000 USD to our Chase service account. Please include the wire reference and follow up with the confirmation so we can be on the look out.
>
> Also as per our agreement, the company must issue additional 8,606 common shares. Once both of the above items are satisfied we will release both of the Notes and will consider it paid.
>
> Total amount of shares owed to Bellridge Capital, LP. as per our agreements 122,485 common stock. Please issue it in a book entry form and send us a TA statement.
>
> ***Please reply confirm receipt of this email.***

(*See* Ex. E (emphasis in original).)

38. The First Spoofed Email also attached a .pdf containing wire details that were designed to mirror the look and feel of the authentic wire instructions sent by Mr. Klimov the previous day, but were, in fact, fraudulent instructions to wire the funds to a bank account maintained by an unknown third party.

39. On April 11, 2019, Verb caused a wire transfer to be made to what it thought was Bellridge in the amount of $2,025,000, pursuant to the instructions included in and attached to the First Spoofed Email.

***Verb's Efforts to Recover and Redirect the Payment to Bellridge.***

40. Shortly after effectuating the wire transfer of $2,025,000 to what it thought was Bellridge's bank account, Messrs. Cutaia and Clayborne learned that the funds were being returned to Bank of America ("BofA") (Verb's bank from which the funds had been wired) for reasons that

were unclear to Verb. This return of funds surprised Messrs. Cutaia and Clayborne, since Verb had effectuated the wire transfer in accord with what it believed were "Final" wiring instructions that it had received from Mr. Klimov on April 11, 2019.

41. Upon learning that the funds were being returned to its account at BofA, Verb subsequently consulted with high-level BofA representatives to determine why the funds had not reached their intended destination.

42. On April 12, 2019 at 2:37 pm EDT, another email was sent from the "spoofed" address robertk@bellridlgecapital.com to Messrs. Haugton, Cutaia and Clayborne, presumably from the same sender as the First Spoofed Email, stating that he or she was "informed the wire is being returned to the sender with no explanation" (the "Second Spoofed Email," and, together with the First Spoofed Email, the "Spoofed Emails").

43. The Second Spoofed Email also included a request to wire the payoff amount to an account at a different bank, and attached a .pdf containing wire details that were, again, designed to mirror the look and feel of the authentic wire instructions sent by Mr. Klimov on April 10, 2019, but were, in fact, fraudulent instructions to wire the funds to an unknown destination bank account.

44. A true and correct copy of the Second Spoofed Email is attached as **Exhibit F**.

45. On April 15, 2019, Verb effectuated a wire transfer in the amount of $2,025,00 to what it believed was Bellridge's bank account, pursuant to the instructions included in and attached to the Second Spoofed Email.

46. On April 16, 2019, Mr. Klimov informed Verb that Bellridge had not yet received the wired funds. Mr. Cutaia responded that he had been advised that the wire would hit Bellridge's account with 24-48 hours.

47. When Bellridge had not received the funds by April 18, 2019, Verb began to investigate the matter in consultation with BofA, in order to determine why the funds had not reached Bellridge.

48. Through due diligence conducted by Verb, with the assistance of BofA, Verb soon learned that the funds had not been wired to Bellridge as Verb had intended, but instead had been transmitted to a fraudulent bank account that had been opened by an unknown third party approximately one week earlier (the "Spoofed Bank Account").

49. Upon making this discovery, Verb notified local law enforcement and filed a report regarding this "spoofing" incident with the Federal Bureau of Investigation.

50. Moreover, Verb worked diligently and exhaustively with BofA and representatives of the bank where the Spoofed Bank Account had been opened to ensure that the funds were returned to BofA, and transmitted the funds to Bellridge immediately thereafter.

51. On May 7, 2019, Verb wired $2,025,000 to Bellridge in full satisfaction of Verb's payment obligations under the Notes, a mere eight days after what would have been the expiry of the 15-day "cure" period under the Notes had an actual, and not manufactured, Event of Default occurred (which did not occur).[4]

52. At all relevant times, Bellridge was kept apprised of all efforts being undertaken by Verb to recover the funds and ensure their expeditious delivery to Bellridge. At no point between April 11, 2019—when Verb wired the funds to what it believed, in good faith, was Bellridge—and May 7, 2019—when Bellridge ultimately received the funds after the spoofing

[4] As previously noted, the Mandatory Prepayment Date was on or before April 12, 2019, and the Notes provided that, if Verb failed to make payment by then, it would have 15 days to "cure" the default. (*See* Exs. B, D § 6(a)(i)). Fifteen days from April 12, 2019 would have been April 27, 2019, a Saturday, when wire transfers cannot be effectuated. Accordingly, April 29, 2019 (a Monday) was the next possible day that a wire transfer could have been sent and, thus, the cure date under the Notes had there been an actual, and not manufactured, Event of Default thereunder (which there had not been).

incident—did Bellridge convey any intention to declare an "Event of Default" due to the Spoofed Emails or to seek conversion to Common Stock of what it later deemed to be an "outstanding balance" on the Notes.

***Bellridge's Improper Attempt to Obtain a Windfall.***

53. Despite acknowledging that Verb repaid the full outstanding principal amount under the Notes, Bellridge nonetheless improperly declared an "Event of Default" due to the brief delay in payment caused solely by the Spoofed Emails.

54. Specifically, on May 15, 2019, Bellridge, through its counsel, Meister Seelig & Fein LLP, sent a purported notice of conversion (the "Purported Notice of Conversion") to Verb. In its cover letter, Bellridge took the position that an "Event of Default" had occurred due to what it deemed to be Verb's belated payment, on May 7, 2019, of the then-outstanding principal amount under the Notes. True and correct copies of the letter from Bellridge's counsel and the accompanying Purported Notice of Conversion, are attached hereto as **Exhibit G**.

55. An "Event of Default" is defined in the Notes as "any default in the payment of (A) the principal amount of this Note . . . as and when the same shall become due and payable (whether on the Maturity Date, the Mandatory Prepayment Date, a Conversion Date or by acceleration or otherwise) which default is not cured within fifteen (15) calendar days." (*See* Exs. B, D § 6(a)(i)). If an "Event of Default" occurs, the outstanding principal amount under the Notes becomes due at the "Mandatory Default Amount," defined as one-hundred ten percent (110%) of the outstanding principal amount, either in cash or convertible into Verb common stock, at Bellridge's election. (*See id.* §§ 1, 6(b)).

56. As noted above, Verb successfully recovered the funds that had been mis-routed due to the Spoofed Emails, and re-routed the same to Bellridge on May 7, 2019. Due to Verb's

expeditious handling of the spoofing incident—which upon information and belief, resulted from a hacking of Bellridge's computer network—Bellridge received these funds a mere eight days after what would have been the end of the applicable "cure" period under the Notes (*i.e.*, had an actual, not manufactured, Event of Default occurred, which did not occur).

57. In the May 15, 2019 letter from its counsel that accompanied its Purported Notice of Conversion, Bellridge acknowledged that it had received payment from Verb in the amount of $2,025,000, but asserted that, due to an "Event of Default," the Notes were due at the Mandatory Default Amount, which it calculated to be $2,025,000, plus an additional 10% penalty in the amount of $202,500, yielding a total outstanding balance of $2,227,500. Crediting Verb for the $2,025,000 payment, Bellridge contended that the "outstanding balance" due under the Notes, as of May 15, 2019, was $202,500, the payment for which it deemed to be 144,643 shares of Common Stock based on its purported conversion of such "outstanding balance." (*See* Ex. G.)

58. Bellridge demanded this "outstanding balance" from Verb despite knowing that the sole cause of Bellridge's failure to receive payment by the Mandatory Repayment Date was a cybersecurity breach, most likely of its own network. Even if the cybersecurity breach had been of Verb's or AGP's[5] network—of which there is no evidence as to either—the Spoofed Emails were entirely beyond Verb's control and wholly unforeseeable to it at the time it executed the Transaction Documents. The Spoofed Emails made Verb's performance of its payment obligations on or before the Mandatory Payment Date both impracticable and impossible. Yet, Bellridge seeks to leverage this unforeseeable event into a windfall for itself, contravening both the letter and the spirit of the Transaction Documents.

[5] As previously alleged, AGP was on virtually all of the emails relating to the bridge financing transaction, and liaised between Verb and Bellridge with respect to the same.

***Bellridge's Improper and Ineffective and Notice of Conversion.***

59. In addition to declaring an "Event of Default," Bellridge has taken the position in its Purported Notice of Conversion that it is entitled to convert what it deems to be the "outstanding balance" under the Notes into shares of Common Stock. (*See* Ex. G.) However, even if an "Event of Default" had actually occurred entitling Bellridge to do so (which did not occur), Bellridge's Purported Notice of Conversion is defective on its face and is, therefore, void *ab initio*.

60. Indeed, the Notes provide that at any time on or after the occurrence of an Event of Default that has not been cured, Bellridge may, subject to certain limitations, convert the Notes into shares of Verb Common Stock at the Mandatory Default Amount. (*See* Exs. B, D § 4(a)). To exercise its right of conversion following an Event of Default, Bellridge must deliver to Verb a Notice of Conversion that specifies the principal amount of the Notes to be converted and the date on which such conversion shall be effected. (*Id.* § 4(a)).

61. Assuming the occurrence of an actual, and not manufactured, Event of Default (which is not the case here), the Notes impose phases upon Bellridge's exercise of any conversion rights. Section 6 (b) of the Notes expressly preclude Bellridge from converting more than 25% of the Mandatory Default Amount for 15 calendar days after the end of the applicable cure period with respect to an Event of Default. After this initial 15-day period, Bellridge may then convert an additional 25% of the Mandatory Default Amount every 15 calendar days thereafter until the Notes are no longer outstanding. (Exs. B, D § 6(b)).

62. Thus, even assuming the Purported Notice of Conversion were valid (which it is not), Bellridge would have been restricted from converting more than 25% of the Mandatory Default Amount until May 12, 2019, *i.e.*, 15 days from the end of the applicable cure period had an actual, and not manufactured, Event of Default occurred. The applicable cure period would

have run from April 12, 2019 (the Mandatory Prepayment Date) until April 27, 2019. As such, on May 12, 2019, and, concomitantly, on May 15, 2019, when it sent the Purported Notice of Conversion, the most Bellridge would have been entitled to convert to Common Stock was 25% of $202,500, or $50,625.

63. Bellridge's Purported Notice of Conversion, however, improperly seeks conversion of the *entire* "principal amount" remaining under the Notes, which, by Bellridge's own calculation, is $202,500. Bellridge's Purported Notice of Conversion is, thus, invalid on its face because it contravenes Section 6 of the Notes which requires that any conversions be effected in 'phased' increments of 25%. (Exs. B, D § 6(b)).

64. Notwithstanding this fatal defect, Bellridge has taken the position that, if Verb fails to deliver the conversion shares of Common Stock, Verb must pay Bellridge liquidated damages in the amount of $10 per trading day for every $1,000 of principal amount being converted, increasing to $20 per trading day on the fifth (5th) trading day after such liquidated damages begin to accrue, until the conversion shares are delivered or Bellridge rescinds the conversion. (*See* Exs. B, D § 4(c)(iv)). This constitutes yet an additional bad faith stratagem by Bellridge to exploit, and benefit from, the Spoofed Emails.

65. Pursuant to its right under the Notes (*see* Exs. B, D § 4(a)), on May 16, 2019, Verb sent a letter (the "Objection Notice"), objecting to Bellridge's Purported Notice of Conversion, in which Verb explained that Bellridge's declaration of an Event of Default under Notes and subsequent attempt to exercise its conversion rights thereunder was a wholly improper action designed to benefit Bellridge from a delay in payment caused by the Spoofed Emails, which, upon information and belief, were the result of a cyberbreach of Bellridge's computer network. Accordingly, in the Objection Notice, Verb rejected Bellridge's Purported Notice of Conversion

on the grounds that no Event of Default had occurred under the Notes and that Bellridge, thus, was not entitled to convert any "outstanding balance" thereunder to Common Stock. A true and correct copy of the Objection Notice is attached hereto as **Exhibit H**.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment that No Event of Default Occurred)**

66. Verb re-alleges and incorporates paragraphs 1-65 as if fully set forth herein.

67. The parties executed the Transaction Documents, which constitute, collectively, a valid and enforceable contract.

68. The Transaction Documents required Verb, within three business days after the closing of its FPO (as previously defined, the "Mandatory Prepayment Date"), to pay Bellridge an amount of cash equal to the then-outstanding principal amount under the Notes.

69. On April 9, 2019, Verb closed its FPO.

70. On April 9, 2019, the outstanding principal amount under the Notes was $2,025,000.

71. On April 11, 2019, Verb effectuated a wire transfer to what it thought was Bellridge in the amount of $2,025,000, pursuant to the instructions included in and attached to the First Spoofed Email.

72. On April 15, 2019, Verb effectuated a wire transfer to what it thought was Bellridge in the amount of $2,025,000, pursuant to the instructions included in and attached to the Second Spoofed Email.

73. Upon information and belief, the Spoofed Emails resulted from a prior cybersecurity breach of Bellridge's computer network.

74. The Spoofed Emails were unforeseeable to Verb at the time the Transaction Documents were executed, and their non-occurrence was a basic assumption on which Verb agreed

to enter into the Transaction Documents. Further, the Spoofed Emails arose from circumstances that were entirely beyond Verb's control, and rendered impracticable Verb's performance of its payment obligation before the Mandatory Prepayment Date.

75. In addition, the Spoofed Emails were an unforeseeable intervening occurrence that could not have been anticipated or contemplated in the Transaction Documents, and which rendered Verb's prepayment before the Mandatory Prepayment Date impossible.

76. In any event, Verb took extraordinary steps to ensure that the funds were recovered and ultimately paid to Bellridge within eight days of the last day allowed under the Transaction Documents for Verb to cure any default (*i.e.*, had an actual, and not manufactured, Event of Default occurred). Any delay in the transmission of payment to Bellridge was entirely beyond Verb's control.

77. As a result of the events described in the foregoing paragraphs, there exists an actual and justiciable controversy of sufficient immediacy, within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., to warrant the issuance of a declaratory judgment that no Event of Default has occurred under the Transaction Documents.

78. Accordingly, Verb seeks the issuance of an Order declaring that no Event of Default has occurred under the Transaction Documents and, thus, there is no outstanding balance under the Notes, nor any entitlement by Verb to convert the same, or any other amount, into shares of Common Stock at the Mandatory Default Amount, nor to receive liquidated damages for failure by Verb to deliver the Common Stock.

## SECOND CLAIM FOR RELIEF
**(Declaratory Judgment that Bellridge's Notice of Conversion is Null and Void)**

79. Verb re-alleges and incorporates paragraphs 1-78 as if fully set forth herein.

80. The Transaction Documents provide that, at any time on or after the occurrence of an Event of Default that has not been cured, Bellridge may, subject to certain limitations, convert the Notes into shares of Common Stock at the Mandatory Default Amount.

81. To effect a conversion, the Notes require Bellridge to deliver to Verb a Notice of Conversion that specifies the principal amount of the Notes to be converted and the date on which such conversion shall be effected.

82. However, as alleged hereinabove, no "Event of Default" occurred under the Notes, and thus Bellridge lacks any entitlement to conversion.

83. Even if Bellridge were entitled to conversion (which it is not), its Purported Notice of Conversion of May 15, 2019 is defective and void *ab initio* because it violates the Notes' requirement that any conversions be phased in 25% increments as detailed above. (Exs. B, D § 6(b)).

84. Further, because Bellridge lacks entitlement to conversion, and because its Purported Notice of Conversion is void in any event, Bellridge is not entitled to liquidated damages, or to any other amounts, costs, expenses or damages, in connection with its improper declaration of an "Event of Default" as described herein.

85. As a result of the events described in the foregoing paragraphs, there exists an actual and justiciable controversy of sufficient immediacy, within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., to warrant the issuance of a declaratory judgment that Bellridge's Purported Notice of Conversion dated May 15, 2019 is defective on its face and is, therefore, void *ab initio*.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract)**

86. Verb re-alleges and incorporates paragraphs 1-85 as if fully set forth herein.

87. The parties executed the Transaction Documents, which constitute valid and enforceable contracts.

88. Verb fully performed all of its obligations under the Transaction Documents by, among other things, scheduling a wire transfer in repayment of the outstanding principal amount under the Notes, on or before the Mandatory Prepayment date, and, thereafter, upon learning that payment had been misdirected to a third party's bank account due to the Spoofed Emails, undertaking extraordinary efforts to ensure that the funds were transferred expeditiously to Bellridge.

89. Despite receiving repayment of the full outstanding principal amount under the Notes, and despite knowing that the brief delay and transmission of payment was caused by a "spoofing" incident was beyond Verb's control and unforeseeable to it when the Transaction Documents were executed, Bellridge nonetheless improperly declared an "Event of Default" under the Notes, demanding an additional 10% penalty and claiming entitlement to other remedies, including the right to convert the Notes' outstanding principal amount into shares of Common Stock. Bellridge declared further entitlement to liquidated damages in the event that Verb were to fail to deliver the converted Common Stock.

90. In addition, the Notes expressly preclude Bellridge from converting more than 25% of the Mandatory Default Amount for 15 calendar days after the end of the applicable cure period with respect to an Event of Default, and an additional 25% of the Mandatory Default Amount every 15 calendar days thereafter until the Notes are no longer outstanding. (Exs. B, D § 6(b)).

91. Thus, even assuming the Purported Notice of Conversion were valid (which it is not), Bellridge would have been restricted from converting more than 25% of the Mandatory Default Amount until May 12, 2019, *i.e.*, 15 days from the end of the applicable cure period, had

an actual, and not manufactured, Event of Default occurred. As such, on May 12, 2019, and concomitantly, on May 15, 2019, when it sent the Purported Notice of Conversion, the most Bellridge would have been entitled to convert to Common Stock was 25% of $202,500, or $50,625.

92. However, in its Purported Notice of Conversion, Bellridge improperly sought to convert $202,500, which it improperly deemed to be the entire "outstanding balance" under the Notes. Accordingly, the Purported Notice of Conversion constitutes a breach of the Notes' requirement that conversion be elected in "phases."

93. Bellridge's bad faith attempt to leverage the Spoofed Emails into a windfall for itself, by improperly declaring an "Event of Default" and then seeking to convert the equivalent of what it deems to be the entire "outstanding balance" of the Notes into shares of Common Stock violates both the letter and the spirit of the Transactions Documents, and constitutes a breach thereof.

94. By way of Bellridge's breach, Bellridge is liable for damages in an amount to be determined at trial, together with interest, incidental costs, and attorneys' fees,[6] as to be proven at trial.

---

[6] Each Note expressly provides that "[i]f any party shall commence an action or proceeding to enforce any provisions of this Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding." (*See* Exs. B, D § 7(d)).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment as follows:

A. A declaration that no Event of Default has occurred under the Transaction Documents and, thus, there is no outstanding balance under the Notes, nor any entitlement by Verb to convert the same, or any other amount, into shares of Common Stock at the Mandatory Default Amount, nor to receive liquidated damages for failure by Verb to deliver the Common Stock;

B. A declaration that Bellridge's Purported Notice of Conversion dated May 15, 2019 is defective on its face, and is, therefore, void *ab initio*;

C. An award of monetary damages in amount to be determined at trial due to Bellridge's breach of the Transaction Documents;

D. An award of Verb's costs and attorneys' fees incurred in this action; and

E. Further relief as the Court may deem just and proper.

Dated: New York, New York
May 23, 2019

**BAKER & HOSTETLER LLP**

By: Michael Gordon

Michael S. Gordon
David McMillan

45 Rockefeller Plaza
New York, NY 10111-0100
Telephone: (212) 589-4265
Facsimile: (212) 589-4280
Email: mgordon@bakerlaw.com

*Attorneys for Plaintiff*
*Verb Technology Company, Inc.*